[Civ. No. 347.  Fourth Appellate District.—October 28, 1931.]

ALICE McGUIGAN et al., Appellants, v. J. D. MILLAR et al., Respondents.

Haas & Dunnigan, H. C. Johnston, Walter F. Haas and Howard F. Shepherd for Appellants.

Hewitt, McCormick & Crump, L. B. Stanton and A. I. McCormick for Respondents.

BARNARD, P. J.—This action was brought by the plaintiffs to quiet their title to some 287 lots adjoining Hollywood, in the city of Los Angeles. The entire dispute is between plaintiff Alice McGuigan and defendant and respondent J. D. Millar and, for convenience, we will hereafter refer to them as if they were the only parties. The plaintiff claims title to these lots under two grant deeds, in both of which a bank formerly holding title to the lots as trustee, is the grantor. One deed covered 191 lots, which will hereafter be referred to as parcel A, and the other deed covered 96 lots, hereafter referred to as parcel B. It is admitted that about the time plaintiff acquired title to these lots in this manner, she gave to the defendant a so-called option to purchase the lots. It is defendant's contention that this so-called option was and is in fact a mortgage representing an extension of a previous debt owed by him to the plaintiff, while plaintiff maintains that the instrument in question was merely an option to purchase, which option was not exercised by the defendant within the time limited, or at all.

Certain facts are not disputed, including the following: In 1911 the defendant borrowed $5,000 from the husband of plaintiff, deeding the lots referred to as parcel A to a trustee to secure the repayment of the same. After the husband's death this obligation became the property of the plaintiff. At that time the defendant was the owner of the lots referred to as parcel B, which were free from encumbrance although, for his own convenience, he had placed the legal title thereto in the same trustee that held the legal title to parcel A. On March 3, 1916, $4,200 principal, with some interest, was due to the plaintiff on the loan referred

to. On that day she wrote to the trustee demanding that foreclosure proceedings be started. The trustee wrote the defendant that unless the amount due was paid on or before March 13, 1916, foreclosure proceedings would be started. Publication of a notice of sale was commenced on May 6, 1916, and the sale was set for June 22, 1916. On June 21, 1916, on instructions from the defendant, the trustee deeded the lots referred to as parcel B to the plaintiff, which deed was recorded. On that same day the plaintiff executed and delivered to the defendant the following instrument:

"Option to Purchase Land

"In consideration of one dollar ($1.00) to me in hand paid the receipt of which is hereby acknowledged, I do hereby give to J. D. Millar, of Los Angeles, California, the option of buying for the sum of five thousand two hundred seventy-nine dollars and eighty-six cents ($5,279.86) in cash, the following described lots and parcels of land situate in the County of Los Angeles, State of California, and particularly described as follows: (here follows a description of all of the lots referred to as parcel A and parcel B)

"Subject, however, to all state, county and municipal taxes, or special assessments of any kind that may now be a lien upon said land or which may hereafter become a lien upon said land; provided, however, that if the undersigned shall at any time during the live of this option pay any taxes, or special assessments upon any of said property, that the amount so paid for such tax or special assessment shall be added to the selling price hereinabove mentioned.

"Said J. D. Millar shall have the right to close this option at any time within six months from the date hereof, and I agree to execute to him, or to any one named by him, a deed in form sufficient to pass the title to the property. Upon the execution of said deed, I am to be paid the further sum of five thousand two hundred seventy-eight dollars and eighty-six cents ($5,278.86) in cash, and any amounts which I may have paid for taxes, or special assessments, in payment of the purchase price of said land, but if said option is not closed within six months from date hereof, I may retain the said sum of one dollar ($1.00) so paid as aforesaid, as liquidated damages. If said option is closed within six months from the date hereof the amount paid as aforesaid is to be applied towards the purchase price.

"Time is of the essence of this contract, and should said option be not accepted and closed by twelve o'clock noon, Friday, December 22, 1916, the same shall be void and ineffective for any purpose whatsoever, and the undersigned shall be forever released from any liability hereunder, and the same shall in no wise, constitute any lien or encumbrance whatever upon the real estate hereinabove described.

"This option shall not be recorded or placed of record.

"In witness whereof, I have hereunto set my hand and seal this 21st day of June, 1916.

"ALICE McGUIGAN."

On June 22, 1916, the trustee completed the sale of the lots referred to as parcel A in accordance with the notice of sale. These lots were bought in in the name of the plaintiff for the exact amount then due on the debt, and the trustee executed and delivered to the plaintiff a deed to the lots, which deed was recorded. The defendant did not pay the amount named in the option within six months from its date, and this action to quiet title was filed on August 18, 1924. In his answer the defendant sets up an agreement for an extension of his loan from the plaintiff; that the lots referred to as parcel B were conveyed to the plaintiff in consideration of such an extension and as additional security; and that the entire transaction constitutes a mortgage. The defendant prays that the court find that the transaction constituted a mortgage to secure his indebtedness to the plaintiff, with interest; that it be found that he has an equity of redemption in the property; that it be found that the plaintiff has no title or interest in the property other than a lien for an unforeclosed mortgage; that the plaintiff be required to give an account as to the amount of moneys expended by her on taxes or assessments; that a reasonable time be set for the payment to the plaintiff by the defendant of any and all moneys found to be due her; and that upon the payment of said sum to her or into court for her benefit, the plaintiff be required to convey the real property in question to the defendant. After a trial upon the issues thus joined, the court found in favor of the defendant and an interlocutory decree was entered, from which judgment this appeal is taken.

The law is well settled that a transfer of an interest in property, although absolute on its face, if in fact intended

only as security for a debt, is to be deemed a mortgage. (Civ. Code, secs. 2924 and 2925.) In Pomeroy's Equity Jurisprudence, page 2824, section 1192, the principle is thus expressed: "The fundamental principle of equity is, that whenever a conveyance of land is given for the purpose of securing payment of an existing debt, it is a mortgage."

In *Hodgkins* v. *Wright*, 127 Cal. 688 [60 Pac. 431], the court said: "The question was whether they were given to secure the performance of an obligation—that is, to secure the payment of a debt. If they were given for that purpose they were mortgages, no matter how expressly the parties agreed that they should not be so deemed. They cannot, by agreeing to call or to consider an instrument which hypothecates real estate for the payment of a debt something other than a mortgage, avoid the necessity of foreclosure or deprive the debtor of his right to redeem. If in fact and in law the instrument is a mortgage, it does not matter that the parties intend and stipulate that it shall be something else, and that, in case of a failure to pay, the title of the mortgagee shall be absolute."

So strong is the equitable principle involved, that the court said in *Montgomery* v. *Spect*, 55 Cal. 352: "The fact of a subsisting debt to secure the payment of which a deed of real property may be given, must be proved like any other fact in a case. 'But', as Mr. Justice Gaston says, in *McDonald* v. *McLeod*, 1 Ired. Eq. (36 N. C.) 277, 'in examining transactions between borrowers and lenders, and between necessitous men and their creditors, courts of equity, aware of the unequal relation of the parties and of the facility by which the former may be surprised into improvident arrangements, and of the moral coercion which the latter can exercise over their apparent freedom of action, are particularly attentive to any circumstances tending to show an inconsistency between the form of an act and the intent of the parties, and will take great pains to get at the substance of what was done or intended to be done by them'."

No extended citation of authorities is necessary and in fact the briefs in this case show little dispute between the parties as to the law upon this point, the main reliance of appellant being that certain facts are controlling under the evidence, in spite of contrary findings made by the trial court. The rule of law controlling in such a situation is thus expressed

by the court in *Couts* v. *Winston,* 153 Cal. 686 [96 Pac. 357] : "But whether or not the evidence offered to change the ostensible character of the instrument is clear and convincing is a question for the trial court. (Citing cases.) In such cases, as in others, the determination of that court in favor of either party upon conflicting or contradictory evidence is not open to review. in this court. (*Sherman* v. *Sandell,* 106 Cal. 373 [39 Pac. 797].) If, therefore, the evidence offered by plaintiffs, taken by itself, was sufficiently 'clear, satisfactory and convincing' to satisfy the trial court that the deed was in fact a mortgage, the finding made cannot be overthrown merely because numerous witnesses, whose character is not impeached, gave positive testimony to the contrary effect. As was said in *Wadleigh* v. *Phelps,* 149 Cal. 627, 637 [87 Pac. 93, 98, the appellate court 'will not disturb the finding of the trial court to the effect that the deed is a mortgage, where there is substantial evidence warranting a clear and satisfactory conviction. to that effect. All questions as to preponderance and conflict of evidence are for the trial court.' "

As expressed by appellant, the main question to be decided is whether or not a debt from the respondent to the appellant existed after June 22, 1916. The trial court found as a fact that the appellant agreed to give to the respondent an extension of time within which to pay his debt, and that in consideration therefor, the respondent gave to the appellant additional security in the form of a deed covering the lots referred to as parcel B, and that the respondent, as a part of the transaction, agreed to pay said indebtedness with interest to the appellant. The real question before us is whether or not the evidence sustains these findings. In considering this question, it will be necessary to refer to certain other evidence introduced. The so-called option, in form, merely gives to the respondent the right to buy the real property described for the sum of $5,279.86, but it is conceded that at the time it was delivered, the appellant signed and delivered to the respondent a letter dated June 21, 1916, addressed to respondent, reading as follows: "In reference to that certain option of even date herewith, I do hereby agree that I will receive as full payment for said property the sum of $4,981.00 with interest thereon at the rate of 1% per month up to the date upon which you make payment of the

said sum of $4,981.00. It being understood that the sum of $5,279.86 mentioned in said option includes interest at 1% per month for six months from date.'' (Here follows a statement by the appellant that she has also received a deed to the lots described in parcel B, the description being set out in full and the letter being signed by the appellant.)

It will be observed that this letter sets forth that the price named in the option is in reality the price of $4,981, plus interest up to the expiration of the option, and that the price to be paid by the respondent is not necessarily to be the price named in the option, but is to be this sum of $4,981 plus interest up to the date he makes payment.

It also appears from the evidence that the amount named in the letter, $4,981, is the exact amount owed by the respondent to the appellant on the previous indebtedness up to that date. The original memorandum made out at that time by the attorney for appellant showing how that figure was arrived at, and that it is the amount then due to the appellant, was introduced in evidence. It is undisputed that on June 21, 1916, the day the option and the letter referred to were signed, the respondent caused the trustee to deed to the appellant the lots referred to as parcel B, in which she was not previously interested. It further appears that this deed to appellant was executed by the trustee upon the authority of a letter dated June 21, 1916, and stamped by the trustee as received on that date, which letter reads as follows:

"Hellman Commercial Trust & Savings Bank
Los Angeles, Cal.
Received
Jun 21 1916
Trust Dept.
C. H. Randall

"Los Angeles, Calif., June 21st, 1916.
"Hellman Commercial Trust & Savings Bank,
"Los Angeles, California.
"Gentlemen:

"Mrs. Alice McGuigan has today given me a further extension upon payment of certain monies mentioned in that certain Trust held by you, upon the following consideration:

"First: That I will put no obstacle in the way of your transferring title to her to those certain lots now held by you

under deed from Oil & Metals Bank & Trust Company, under date of May 22nd, 1913, and recorded on August 2nd, 1913, in Book 5548, at page 276 of Deeds.

"Second: That in consideration of the said extension, and as security for the interest therein at the rate of 1% per month, I will cause to be deeded to her the following described real property: (here follows legal description of the lots referred to as parcel B).

"Third: That Mrs. McGuigan will release by proper conveyance from her lien those three certain lots described as Lot 411 in Tract 798, and lots 92 and 517 in Tract 865; said three lots in tracts being within said County of Los Angeles.

"As I greatly desire to obtain this extension of time within which to refinance these properties, I would ask that you kindly convey same to Mrs. Alice McGuigan, as further security for the payment of the total amount of her obligation, as it may at present appear, together with interest at 12% per annum. You by grant deed without warranty and without consideration to yourselves for such deed.

"Yours respectfully,
"J. D. MILLAR."

It is not disputed that this letter was written by the respondent and signed by him in the office of the bank, which was the trustee referred to, in the presence of the appellant and her attorney after a discussion of the transaction in question, and that the letter was retained by the trustee. It will be observed that this authorization to the bank which resulted in the appellant receiving a deed conveying to her the lots referred to as parcel B, is an important part of the transaction in question and that it throws considerable light upon the question before us. In this letter the respondent prefaces his direction to the trustee to convey the additional lots to the appellant with a statement that the appellant had that day given him a further extension for the payment of the indebtedness for which that same trustee held as security the legal title to the other lots, referred to as parcel A, which lots were noticed for sale under foreclosure on the following day. The respondent also states that he will put no obstacle in the way of the trustee transferring title to the lots referred to as parcel A to the appellant, and further, that in consideration of the extension of time and as security for the interest, he will cause to be deeded to the appellant the other

property referred to as parcel B, which he then goes ahead to direct the trustee to convey to the appellant. It will be observed that, as originally drawn, the order to the bank to convey the property asked them to convey the same to the appellant "as further security for the payment of the total amount of her obligation, as it may at present appear, together with interest at 12% per annum". The respondent testified that the language above quoted was struck from the order to convey, at the request of the trustee, because said trustee wanted an unqualified order to convey. However, the substance thereof was left in the preliminary statement contained in the letter, and is significant not only as showing the intent of the respondent at the time, but also as tending to show the intent of the appellant at that time, since it was signed in her presence and in the presence of her attorney at the office of the bank when the entire transaction was discussed. Taken in consideration with the other evidence, written and oral, this letter is enlightening as to the intent of the parties at the time. It will be remembered that on that same day, June 21st, the trustee executed the order by conveying the lots referred to as parcel B to the appellant. On the next day June 22d, the sale of the lots referred to as parcel A, which had been noticed for that day, was held, and the property bid in by the appellant for the exact amount of her debt. The respondent testified that the trustee insisted upon completing that sale in order to keep its records clear. This finds some corroboration in the fact that the lots referred to as parcel B were conveyed to the appellant on June 21st and on that same day, in the authorization for that deed, the respondent states that he will put no obstacle in the way of the transfer to the appellant of the lots referred to as parcel A, which transfer was in fact accomplished on the succeeding day.

Some of the circumstances leading up to the transaction of June 21st are of interest. During April and May, 1916, following the appellant's request of the trustee that foreclosure proceedings be started, the respondent made several efforts to get an extension of time from the appellant. However, publication of the notice of sale was commenced on May 6, 1916, and the sale was set for June 22d. Respondent testified that the appellant agreed to give him an extension of time for the payment of his loan, if he would get the matter

in proper form and give her further security. On June 13th, respondent sent a letter to appellant's financial adviser, also mailing a copy to appellant, in which he set forth that the appellant had suggested a compromise on the mortgage, that she did not wish him to lose the property, that all she wanted was the money she had loaned, with interest, and in which he suggested as a compromise that if appellant would pay up certain back taxes on the property, he would give to her a new mortgage and would assign to her certain commissions which were due to him, as additional security. Later, the appellant phoned him that she would not accept the additional security offered, whereupon the respondent offered to give her the lots referred to as parcel B in place of the additional security offered in the letter of June 13th. Respondent testified that appellant told him she would accept the lots as further security and that she would see her attorney and arrange the extension of the loan. It further appears that on June 20, 1916, the appellant, the respondent, and their respective attorneys, conferred on the matter during the whole forenoon and that on the afternoon of June 21, 1916, all of said parties met at the banking office of the trustee, and the papers referred to were executed and delivered.

As an additional circumstance it may be stated that the court found upon undisputed evidence that on June 21, 1916, and also at the time this action was commenced, the lots described as parcel A were of the value of $58,000 and the lots described as parcel B were of the value of $13,000. It is not disputed that the respondent paid all the water bills connected with the lots in question up to December, 1917, about a year after the so-called option had expired. There is also evidence that up to the close of the year 1917, with the knowledge of the appellant, the respondent kept the streets on the property in question in repair, repaired water pipes, repaired a water tank at a cost of several hundred dollars, and spent some money on a pumping plant. There is no evidence that the appellant did anything in connection with the property except that she paid that portion of the delinquent taxes which she had agreed to pay in the transaction of June 21, 1916. The evidence shows that the respondent was absent from the state during 1918 and 1919 and that on his return in 1920 he called the appellant several times on

the telephone and tried to ascertain the amount due her including what she had paid for taxes, and told her that he was ready to pay her in full. At that time she told him that the property was worth more money and that she would not discuss the proposition. There is evidence that he went to see her and that she shut the door in his face, and also that he tried to see her in 1922 and 1923. There is no evidence that during this time she informed the respondent of any claim of ownership on her part, and the record shows nothing further done by her until this action was begun in 1924.

A number of things in the testimony of the appellant are of some significance. In connection with her testimony that the so-called option and all other papers were executed after the sale on June 22, 1916, she testified as follows: "Q. How do you account for the instructions being dated the 21st if they are drawn on the 22nd of June? A. I cannot account for it. When my deposition was taken I stated that I considered it the only weak point in my case, and cannot understand it."

She also testified that after the foreclosure sale was finished on June 22, 1916, she had a conversation with the respondent in which he thanked her for her forbearance and said he thought he would be able to take care of the amount of money he owed, in six months. She further testified that in 1922 or 1923 the respondent told her that he was prepared to take back the property and pay her what was due under the original indebtedness, with interest and all that she had expended for taxes, and that all she said in reply was: "What about the increase in values of property in Hollywood, Mr. Millar? That was my answer to him. I didn't say yes or no". She testified as follows: "Q. Now, prior to your receiving this option or giving this option, as you call it, to Mr. Millar, in June, 1916, you told him, did you not, that all you wanted was your money; you did not want to take anybody's property from them? A. Yes, I said that."

It also appears that when her deposition was taken, in answer to a question as to whether the respondent had not told her he would give her the extra lots as additional security, the appellant replied: "He might have said so. I am not saying he did not. I am saying I have no recollection."

While the appellant testified that nothing was done in connection with the so-called option until after the sale was completed on June 22, 1916, the evidence shows that she is mistaken in this important matter. It seems to us equally clear that she is mistaken in her testimony that she granted no extension to the respondent. All of the written instruments of June 21, 1916, were a part of one transaction and should be considered together. We think they are sufficient in themselves to show that the respondent caused these additional lots to be conveyed to the appellant in consideration of an extension of time in which to pay his indebtedness, and that there remained a subsisting debt upon which he was to pay interest. This is corroborated by the oral testimony, by the surrounding circumstances, and by the subsequent conduct of the parties. While the means adopted took the form of an option, under the well-established rules of law, the facts shown by the evidence are sufficient to support the finding of the court that the transaction was in truth and in fact a mortgage securing an indebtedness, the time for the payment of which had been extended.

The appellant urges that the right of the respondent to set up a claim of interest in the property is barred by laches and the statute of limitations. The trial court found and we think correctly, to the contrary. It was stipulated at the trial that the appellant was not at any time in possession of the property and that no question of adverse or other possession was involved in the case. It fully appears that any delay was as much or more the fault of the appellant as of the respondent and no reason appears why the respondent was called upon to take any action as long as the appellant was satisfied (*Secret Valley Land Co.* v. *Perry,* 187 Cal. 420 [202 Pac. 449]; *Chapman* v. *Hicks,* 41 Cal. App. 158 [182 Pac. 336]; *Baker* v. *Fireman's Fund Ins. Co.,* 79 Cal. 34 [21 Pac. 357]; Code Civ. Proc., sec. 744).

Appellant also attacks the form of the interlocutory decree entered by the court. By this decree it was found that the appellant has no interest in the real property in question except that she is the owner and holder of a mortgage upon the same, as security for the payment by the respondent of $5,279.86 with interest from December 22, 1916, and for the amount expended by her for taxes and assessments upon and upkeep of the property "as the same shall

hereafter be ascertained". It was then found that the instruments under which appellant claims title constitute a mortgage securing said indebtedness, that the respondent is the owner of the property subject to said mortgage, and that he is entitled to redeem the property from said mortgage. It is then ordered that an accounting be had for the purpose of ascertaining the amount due from the respondent to the appellant, and a referee is appointed to ascertain said amount and to make his report and file the same with the court. It is then ordered that upon the filing and settling of the report the court will make and enter its final decree. Objection is made that the interlocutory decree contained no provision giving the respondent a reasonable fixed time within which to pay the amount due, and providing that if the amount was not paid within that time the appellant should have the right to have her title to the property quieted as against the respondent. Under the circumstances shown by the record, the accounting provided for was necessary and proper. And the interlocutory decree, after providing for the same, provides that when the same is made and settled the court will make its final decree. The court thus retained jurisdiction to complete the matter and to enter a final decree when the facts shall be before it. The matters complained of as having been omitted from the interlocutory decree can be, and more properly should be, included in the final decree, and we have no doubt will there be properly taken care of.

For the reasons given, the judgment is affirmed.

Marks, J., and Jennings, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on November 24, 1931, and a petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on December 24, 1931.